**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GATSBY FRIMPONG,

                      Plaintiff,

        v.

EVERYREALM INC., REPUBLIC COMPOUND
LLC, d/b/a REPUBLIC REAL ESTATE, REPUBLIC
OPERATIONS LLC, d/b/a REPUBLIC, OPENDEAL
INC., d/b/a REPUBLIC, OPENDEAL PORTAL LLC,
d/b/a REPUBLIC, JESSE YORIO, in his individual and
professional capacities, and JANINE YORIO, in her
individual and professional capacities,

                      Defendants.

Index No.: 1:22-10487

**COMPLAINT &**
**REQUEST FOR EMERGENCY**
**T.R.O**

**Jury Trial Demanded**

Plaintiff Gatsby Frimpong, by his counsel, Seppinni LLP, alleges based on information and

belief, at all relevant times, as follows:

## PRELIMINARY STATEMENT

1.      CEO Janine Yorio, holds digital real estate company Everyrealm[1] out as a paragon

of progressive tech entrepreneurship—the reality is anything but.

2.      Defendants have used their positions of power to dupe Black employees, threaten

them, sexually harass, bully, investigate, and sue them on trumped up, frivolous, and fabricated

allegations.

---

[1] "Everyrealm" includes reference to EVERYREALM INC., REPUBLIC COMPOUND LLC d/b/a
REPUBLIC REAL ESTATE, REPUBLIC OPERATIONS LLC d/b/a REPUBLIC, OPENDEAL
INC. d/b/a REPUBLIC, OPENDEAL PORTAL LLC d/b/a REPUBLIC where relevant herein.

3.      Since Mr. Frimpong confidentially made Defendants' aware of his potential claims against them in July 2022, Defendants have threatened him with lawsuits, sanctions, and massive personal liability if he files this lawsuit.

4.      In fact, based on nothing more than a wrongheaded (and illegal) wish to intimidate Mr. Frimpong into silence, Ms. Yorio and Everyrealm sued Mr. Frimpong in secret forced arbitration to silence him in reprisal for filing a charge of discrimination with the EEOC, and to preempt his filing of this lawsuit. Defendants seek a declaratory judgment from the arbitrator that Mr. Frimpong did not suffer sexual harassment, *inter alia*. This is in plain violation of the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act.

5.      This retaliatory arbitration violates numerous laws, including the recently passed Speak Out Act (S.B. 4524), which invalidates forced pre-dispute non-disparagement and non-disclosure agreements in relation to this Sexual Harassment Dispute.

6.      Defendants have repeatedly demanded that Mr. Frimpong sit "individually" for a two-hour investigatory interview with Defendants' "independent" investigator.

7.      After Mr. Frimpong understandably refused to sit for an interrogation by his former employer's agent, the investigator divulged the contents of her conversation with Mr. Frimpong's counsel to Defendants' lawyers despite assurances that the conversation was confidential.

8.      The purported "independent investigation" was a farse.

9.      As a result of Defendants' unlawful conduct and the hostile work environment it created, Mr. Frimpong asserts claims of sexual harassment, discrimination, retaliation, whistleblower violations and interference with his protected rights under New York Labor Law § 194, the New York Whistleblower Law N.Y. Labor Law § 740, et seq., the N.Y. Labor Law § 215; § 1981, Title VII, Defamation, and Intentional Infliction of Emotional Distress.  Mr. Frimpong

seeks emergency junctive relief as to Defendants' illegal arbitration proceeding, declaratory relief, monetary damages, attorneys' fees, and all other appropriate relief.

## THE PARTIES

10.     Plaintiff Gatsby Frimpong is a citizen of the State of Texas. At all relevant times, Mr. Frimpong met the definition of an "employee" and/or "eligible employee" under all applicable statutes. At all relevant times herein, Mr. Frimpong was an employee of Defendant Everyrealm and/or the entities that make up d/b/a Republic.

11.     Defendant Everyrealm Inc. is a so-called digital real estate company and a Delaware corporation with its principal place of business in New York, New York. At all relevant times, Everyrealm met the definition of an "employer" or "covered employer" under all applicable statutes.

12.     Defendant Republic Compound LLC d/b/a Republic Real Estate was launched by Republic as a place where the general public can "invest" in "digital real estate at www.republicrealm.com." It is a Delaware Corporation with its principal place of business in New York City, NY.

13.     Defendant Republic, an alternative asset crowdfunding company and a Delaware Corporation, was Everyrealm's parent company at times relevant herein. Republic and Everyrealm were co-employers of Mr. Frimpong. Republic may be a trade name of Defendants Republic Operations LLC, Opendeal Inc., and Opendeal Portal LLC, *inter alia*. At all relevant times, Republic met the definition of an "employer" or "covered employer" under all applicable statutes. Any use of "Republic" in this complaint includes reference to Defendants Republic, Republic Operations LLC, Opendeal Inc., and Opendeal Portal LLC. Defendant Republic and or/its entities used the same JustWorks employee management account as Everyrealm and its predecessor

entities did, Everyrealm's CEO worked at both companies during Mr. Frimpong's tenure, and Everyrealm's senior executive team held dual roles at Everyrealm and Republic.

14.     Defendant Republic Operations LLC is a Delaware Limited Liability Corporation that upon information and belief operates under the trade name Republic. At all relevant times, Republic Operations LLC met the definition of an "employer" or "covered employer" under all applicable statutes.

15.     Defendant Opendeal Inc. is a Delaware Corporation that upon information and belief operates under the trade name Republic. At all relevant times, Opendeal Inc. met the definition of an "employer" or "covered employer" under all applicable statutes.

16.     Defendant Opendeal Portal LLC is a Delaware Limited Liability Corporation that upon information and belief operates under the trade name Republic. At all relevant times, Opendeal Portal LLC met the definition of an "employer" or "covered employer" under all applicable statutes.

17.     Defendant Janine Yorio is a member of Everyrealm's Board of Directors and its CEO. She was also employed by Republic during the relevant periods. She subjected Mr. Frimpong to repeated acts of sexual harassment, sexually harassing retaliation, and discrimination. At all relevant times, Ms. Yorio was employed by Everyrealm and/or Republic and met the definition of an "employer" or "covered employer" under all applicable statutes.

18.     Defendant Jesse Yorio is an Everyrealm executive. He was also employed by Republic during the relevant periods. He subjected Mr. Frimpong to repeated acts of retaliation and discrimination. At all relevant times, Mr. Yorio was employed by Everyrealm and/or Republic and met the definition of an "employer" or "covered employer" under all applicable statutes.

**JURISDICTION AND VENUE**

19.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under federal law.

20.     The Court has diversity jurisdiction over this action pursuant to 28 U.S.C § 1332, as there is diversity of citizenship between Plaintiff, a resident of the State of Texas, and Defendants, who are either, upon information and belief, New York State residents and/or are headquartered in New York State, and this action involves a matter in controversy that exceeds $75,000, exclusive of interest and cost.

21.     This Court has supplemental subject matter jurisdiction over Plaintiff's related state and local law claims pursuant to 28 U.S.C. § 1367(a).

22.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district. Defendants' principal place of business is in this district.

23.     Defendants' consented for this dispute to be covered by New York State Law when they wrote, "Governing Law. This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of New York, without giving effect to principles of conflicts of law[,]" in Mr. Frimpong's Employment Letter.

24.     This Sexual Harassment Dispute is properly before this Court under the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act.

**ADMINISTRATIVE PROCEDURES**

25.     Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and received a Notice of a Right to Sue letter therefrom within 90 days of the date of this filing.[2]

26.     Pursuant to NYLL § 215(2)(b), contemporaneously with the commencement of this action, Plaintiff will serve a copy of this Complaint upon the Office of the New York Attorney General, providing notice of the claims set forth in this action.

27.     Plaintiff has complied with any and all other prerequisites to filing this action.

## FACTUAL ALLEGATIONS

### I.     MR. FRIMPONG WAS HIRED BY REPUBLIC

28.     Mr. Frimpong is an experienced Product Manager. Defendants hired him to lead their product management function after he completed successful stints working at Google, Apple, Microsoft, and Cisco.

29.     Mr. Frimpong was offered a job with Republic, on Republic's letterhead. Mr. Frimpong also worked as an employee at Everyrealm Inc. although he never executed an arbitration agreement with them.

### II.    REPUBLIC AND EVERYREALM BOTH EMPLOYED MR. FRIMPONG

30.     Mr. Frimpong's paychecks while at Republic and Everyrealm were deposited into his account from the same Republic bank account.

---

[2] Mr. Frimpong's EEOC charge contains a scrivener's error that lists the last date of discrimination erroneously as March 1, 2022. The actual last date of discrimination was either March 4 or March 5, 2022, which was Mr. Frimpong's resignation date.



31.     In fact, it appears that all Everyrealm employees received their paychecks from a Republic owned and maintained bank account throughout Mr. Frimpong's tenure at Republic and Everyrealm.

32.     This is because Everyrealm's spinout from Republic was on paper only.

33.     Everyrealm's executive team maintained roles at both companies at the same time, even after the spinout. For example, as of the date of this filing, Julia Schwartz's (an Everyrealm board member and executive and a Republic employee) LinkedIn account lists both companies as her current employers.[4]

**Experience**



**Co-Founder**
Everyrealm Inc. · Full-time
Apr 2021 - Present · 1 yr 9 mos

Everyrealm is an investor and innovator in the metaverse and NFT ecosystem. Learn more at www.everyrealm.com.



**Director, Strategic Assets & Initiatives**
Republic
Jun 2020 - Present · 2 yrs 7 mos

Republic is a leading alternative investment platform that gives individual investors access to a wide range of opportunities including early-stage startups, growth-stage/pre-IPO technology companies, crypto, e-sports and video games, real estate, and Main Street investments.

- Co-Founder: Republic Realm Digital Real Estate NFT investment vehicle www.republicrealm.com

---

[3] Screenshot of the Republic account that paid Mr. Frimpong bimonthly, account numbers excluded.
[4] https://www.linkedin.com/in/julia-schwartz-88579354/

34.     Everyrealm's board of directors is overwhelmingly, if not entirely, made up of Republic founders, employees, affiliates and agents. In fact, Everyrealm holds Mr. Durgee, founder of Republic out as a member of Everyrealm's "executive team" in presentations internally and externally. *Infra* ¶ 43 (Republic Realm n/k/a Everyrealm Inc. slide holding Mr. Durgee out as a member of Everyrealm's Executive team and a Republic employee).

35.     Everyrealm's lead investor, Andreessen Horowitz, which poured roughly $20,000,000 into the company, refused to take a board seat at Everyrealm due to the legal risks involved.[5]

36.     Republic facilitated many, if not all, of the initial investment introductions for Everyrealm's Series A funding round.

37.     Everyrealm executives, including Janine Yorio have made public statements on Twitter and elsewhere showing that Everyrealm and Republic are one-and-the-same. For example, *inter alia*:

---

[5] S*ee* Aidan Ryan, *Investors Wary of Board Seats at Crypto Startups Due to Legal Risks*, https://www.theinformation.com/articles/investors-wary-of-board-seats-at-crypto-startups-due-to-legal-risks ("Andreessen Horowitz, for one, has not sought out board seats at some token-issuing startups, partially due to the legal risks involved . . .."")







## Our digital real estate fund

Republic is launching a unique offering for accredited investors. Learn more about investing in digital real estate at www.republicrealm.com.

*This piece is provided by Republic Compound LLC d/b/a Republic Real Estate and is for informational purposes only.*

---

[8] https://twitter.com/Everyrealm/status/1410708246818607110
[9] https://republic.com/blog/real-estate/investing-in-digital-real-estate



10



11

 

CEO and co-founder of Everyrealm, Janine Yurio

**Can you share with us how Everyrealm began? And the founders' backgrounds?**

Everyrealm was founded by me, TJ Kawamura, Julia Schwartz, Jesse Stein, and Kostas Ketikidis. This is our second startup together, having previously built and sold Compound, a fintech app focused on real estate investing. Compound was acquired by Republic, a financial services technology company. The founding team was dabbling with metaverse real estate personally and launched a metaverse real estate investment project through the Republic platform which ultimately grew and became the cornerstone of the diversified metaverse holding company that is Eveyrealm today.

[12]

---

[12] https://sphere-art.com/en/dialogues/172/Everyrealm-is-Shaping-the-Metaverse-With-Holdings-in-Diverse-Metaverse-Platforms-and-Over-100-Metaverse-Real-Estate-Projects





38.     Similarly, Defendant Yorio's publicly available LinkedIn states that her work for Republic Realm (n/k/a/ Everyrealm) took place at/within Republic while she held an additional role there.[15]

---

[13] https://twitter.com/janineyorio/status/1515074597024153601
[14] https://twitter.com/Everyrealm/status/1319749201975078913
[15] https://www.linkedin.com/in/janineyorio/



39.     In addition, numerous public statements, LinkedIn articles, and tweets confirm that Republic and Everyrealm/Republic Realm were direct employers of Mr. Frimpong, or in the alternative were either a single employer or joint employers.

40.     Republic Realm Inc. employed Mr. Frimpong "through its affiliate, Republic Operations LLC," which does business as Republic. Republic Operations LLC shares the same address as other entities doing business as Republic, including the Republic Address listed on Mr. Frimpong's Employment Agreement Letter. This is further evidence that Republic Realm Inc, n/k/a Everyrealm Inc. and Republic were the same company

41.     Mr. Frimpong had a Profit Interest Award Agreement between himself, Republic Realm, Inc., and Republic Operations LLC, which he was unlawfully deprived of.

42.     Throughout his tenure at both companies, Mr. Frimpong reported directly to Republic and Everyrealm executive Janine Yorio.

**III.   DEFENDANTS PAID MR. FRIMPONG LESS ON ACCOUNT OF HIS RACE**

43.     Mr. Frimpong was held out in presentations to investors, partners, and internally as an "experienced" member of the "executive team."



44.     Unfortunately, he was paid less than white employees in similar positions and in junior positions to him at the companies.

45.     Mr. Frimpong earned $125,000 per year while Everyrealm offered a white engineering director $225,000 for a role smaller in scope.

46.     He also received smaller equity grants than similarly situated and less experienced white employees.

47.     Defendants offered no race neutral reasons for this discrepancy in pay, nor could they.

48.     In fact, when Ms. Yorio hired her husband, Defendant Jesse Yorio, over Mr. Frimpong and paid him hundreds of thousands of dollars more than Mr. Frimpong, Mr. Yorio had no previous product management nor software engineering experience.

49.     Mr. Yorio earned a degree in mechanical engineering and spent his career as a hedge fund employee outside of the technology and product design sectors.

50.     When Everyrealm employees confronted Ms. Yorio with the fact that her husband had no software engineering knowledge nor product experience, Ms. Yorio said, "Don't worry, he's an engineer."

51.     Mr. Frimpong believed that Ms. Yorio knew she hired someone less qualified than him for the job and that she relished her power to do so after Mr. Frimpong had rebuffed her advances, as described below.

52.     Meetings with Mr. Yorio were painful because he had no technical knowledge, yet employees were afraid to disagree with him, or ask him questions, because of his marriage with Ms. Yorio, who was known to be capricious and fire employees on the spot without notice.

**IV.     MS. YORIO SEXUALLY HARASSES MR. FRIMPONG**

53.     Mr. Frimpong became the sole caretaker of his younger sibling after their dad tragically died.

54.     Because of this responsibility, Mr. Frimpong spent the time he worked at Everyrealm working from London, UK, where his brother lived.

55.     This tragedy did not stop Ms. Yorio from sexually harassing Mr. Frimpong.

56.     Ms. Yorio told Mr. Frimpong during a meeting that was ostensibly about engineering and product that it is "important [that he] get the customer wet, just like [he] would with a woman."

57.     Mr. Frimpong understood Ms. Yorio's use of the phrase "get the customer wet" to refer to a sexually aroused vagina and to encourage him to be inappropriate with Everyrealm's users.

58.     Ms. Yorio's intention was to humiliate, harass, and shock Mr. Frimpong.

59.     Mr. Frimpong also understood Ms. Yorio's comment to be an attempt to "test the waters" with him. Mr. Frimpong's understanding was confirmed by what had occurred before and afterwards.

60.     This obscene comment followed numerous unwanted overtures by Ms. Yorio toward Mr. Frimpong, including repeated questioning regarding his relationship status and discussions of her past partners.

61.     For example, during a 1:1 meeting, Mr. Frimpong unveiled a new orange and red product colorway that he developed. Ms. Yorio rejected it because she said that the colorway reminded her of a past German man she had "hooked up with."

62.     It was highly concerning to Mr. Frimpong that a company that struggled to generate regular revenue was turning down product ideas based on nothing more than discussions of Ms. Yorio's past romantic partners.

63.     During many of their Zoom meetings, Ms. Yorio would ask if Mr. Frimpong was in a relationship.

64.     Mr. Frimpong is an extraordinarily private person who does not believe his relationship status is something he should divulge nor discuss at work.

65.     He shared that he would rather keep his private life separate from work, but Ms. Yorio disregarded Mr. Frimpong's reasonable request.

66.     Ms. Yorio was so overt regarding her intention to pursue Mr. Frimpong sexually that her misbehavior created tension between Mr. Frimpong and his girlfriend (who overheard Ms. Yorio's get-the-customer-wet-like-you-would-a-woman comment).

67.     Mr. Frimpong explained to his girlfriend that Ms. Yorio had singled him out in this sexually harassing way and that he wanted her to stop.

68.     During multiple meetings, Ms. Yorio stated to Mr. Frimpong that "I feel like Jesse [Yorio] and I are only married in the Metaverse."

69.     Ms. Yorio was gauging Mr. Frimpong's romantic interest in her even though he had indicated and stated numerous times that he was not interested. Mr. Frimpong believed that she wanted him to confess that his relationship with his girlfriend also was not "real," and express reciprocal interest in Ms. Yorio.

70.     Realizing that Ms. Yorio was not going to stop asking him about his relationship status, he told her that he was in a committed relationship.

71.     Once Ms. Yorio learned this, she engaged in a concerted campaign to sideline and eventually force Mr. Frimpong to resign from the companies.

72.     Before Mr. Frimpong rebuffed Ms. Yorio's advances, she told him that the companies needed to hire a head of Product Management and Engineering and that he would be considered for the promotion.

73.     Mr. Frimpong expressed interest in the position, but once he rebuffed her repeated advances Ms. Yorio made it clear that he would not be considered for the role.

74.     Ms. Yorio refused to consider him for the promotion and hired her husband, Mr. Yorio, a finance professional with no experience in software design or product management, for the role instead.

75.     The only other person employed by Defendants who suffered similar treatment at Everyrealm was Teyo Johnson, another Black man. *See Johnson v. Everyrealm, et al.*, 1:22-cv-06669. Defendants sexually harassed and discriminated against Mr. Frimpong because he is a Black man.

76.     In fact, in roughly Mr. Johnson's first week and Mr. Frimpong's last week at the companies, Mr. Frimpong scheduled a meeting with Mr. Johnson to warn him about what it was like as a Black man at Everyrealm.

77.     Mr. Frimpong warned Mr. Johnson about Ms. Yorio's proclivities and the mistreatment he could expect as the soon-to-be only Black man at Everyrealm.

## V.     DEFENDANTS LAUNCH A RETALIATORY, HARASSING, AND DISCRIMINATORY INVESTIGATION INTO MR. FRIMPONG'S EMPLOYMENT HISTORY

78.     Before Mr. Frimpong's resignation, and after Mr. Yorio was hired over Mr. Frimpong, Mr. and Ms. Yorio conspired to launch a retaliatory and unfounded investigation into Mr. Frimpong and his employment history with the intention of pretextually firing Mr. Frimpong.

79.     Defendants began this retaliatory and discriminatory investigation because Mr. Frimpong rebuffed Ms. Yorio and because they prejudicially believed he was stereotypically an 'African scammer.'

80.     He is not.

81.     Mr. Frimpong's family emigrated from Ghana.

82.     Because Mr. Frimpong is a private person, he does not maintain public social media profiles, like many Americans.

83.     However, a simple Google search reveals that Mr. Frimpong worked at the companies he lists on his resume.



[16]

84.    Defendants ignored this readily available evidence and instead proceeded with a discriminatory and retaliatory investigation into his past, going so far as to run a background check, or instructing Everyrealm employees to run one, without Mr. Frimpong's consent.

85.    Defendants lied when they told other employees at Everyrealm that Mr. Frimpong had not worked at the technology companies listed on his resume. These accusations were false and without basis, and Defendants either knew or should have known the falsity of these statements.

86.    Mr. Frimpong was the only Black Product Manager at Everyrealm at the time.

87.    Contrast Mr. Frimpong's treatment with another, white, Everyrealm employee.

88.    After Everyrealm learned that this white employee had intentionally misrepresented his educational background, Ms. Yorio exclaimed to employees, "Everybody does that!"

89.    Mr. Frimpong, no longer able to endure the hostile work environment, quid pro quo advances, and seeing the writing on the wall that unless he gave in to Ms. Yorio's sexual overtures he would be unable to progress in his career with Defendants, resigned unwillingly shortly thereafter.

## VI.    MR. FRIMPONG WILL SUFFER IRREPERABLE INJURY ABSENT AN INJUNCTION

---

[16] Google, Google's I/O 2018 Speaker List, https://ioeaustin2018.splashthat.com/

90.     Mr. Frimpong is the victim of an illegal arbitration proceeding brought by Everyrealm, Janine Yorio, and other Defendants in this case.

91.     The arbitration has improperly accused him of violating non-disparagement and non-disclosure provisions in his employment agreement with Republic.

92.     Defendants are aware that Mr. Frimpong's claims against them constitute a Sexual Harassment Dispute.

93.     The arbitration explicitly states that it was brought in reaction to Mr. Frimpong's confidentially expressed intent to bring this lawsuit and his filing an EEOC Charge of Discrimination.

94.     In violation of the Speak Out Act, as well as numerous provisions of the New York Labor Law, and New York's anti-SLAPP law, after the filing of this lawsuit, Defendants intend to proceed with their retaliatory and plainly illegal arbitration against Mr. Frimpong in retaliation for him bringing today's Sexual Harassment Dispute against them.

95.     The harm is imminent. The first deadline in the arbitration against Mr. Frimpong is currently set for January 9, 2023. Ex. A.

96.     The arbitration also speciailly asks the arbitrator to order a declaratory judgment stating, *inter alia*, that Mr. Frimpong was not sexually harassed.

97.     Mr. Frimpong does not consent to have any Sexually Harassment Dispute decided in arbitration, and wishes to exercise his rights under the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act to prevent Defendants' illegal arbitration from proceeding.

98.     Monetary damages would be insufficient to recompense Mr. Frimpong for the violation of his statutory rights, let alone for the non-monetary declaratory relief Defendants seek in their arbitration against him to falsely establish that Mr. Frimpong was (1) not a victim of sexual

22

harassment in discrimination and (2) breached his employment agreement by filing this lawsuit and EEOC Charge of Discrimination.

**FIRST CAUSE OF ACTION**
**Race-Based Pay Discrimination Under Title VII**
**(Against All Corporate Defendants)**

99.     Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

100.    During the period of the employment of Plaintiff, Defendants were subject to the provisions of Title VII. During that time, Defendants required Plaintiff to perform the same or substantially the same job position as non-Black employees, requiring equal skill, effort, and responsibility under similar working conditions at the same establishment, and paid Plaintiff at a rate of pay, including salary, bonus, and equity less than such non-Black employees. The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity or quality of production, or upon a factor other than gender.

101.    Defendants engaged in patterns, practices and/or policies of employment which willfully, and in the alternative, unwillfully, discriminated against Plaintiff by paying Plaintiff a lesser rate of pay, including salary, bonus, and equity, than that paid to non-Black employees performing the same or substantially similar job duties which require equal skill, effort, and responsibility, and under the same working conditions and at the same establishments.

102.    By the actions described above, among others, Defendants have violated Title VII.

103.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the Title VII, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

104.     Plaintiff is further entitled to punitive damages, reasonable costs, and attorneys' fees.

**SECOND CAUSE OF ACTION**
**Violations of New York Labor Law Equal Pay Law**
**(Against All Defendants)**

105.     Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

106.     The claims brought herein under the New York Labor Law § 194 are brought on behalf of Plaintiff.

107.     During the period of the employment of Plaintiff, Defendants were subject to the provisions of the New York Labor Law § 194. During the employment of Plaintiff, Defendants required Plaintiff to perform the same or substantially the same job position as white employees, requiring substantially similar skill, effort, and responsibility under similar working conditions at the same establishment, and paid Plaintiff at a rate of pay, including salary, bonus, and equity, less than such white employees. The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity or quality of production, or upon a bona fide factor other than race, such as education, training, or experience.

108.     Defendants engaged in patterns, practices and/or policies of employment which willfully, and in the alternative, unwillfully, discriminated against Plaintiff by paying Plaintiff a lesser rate of pay, including salary, bonus, and equity, than that paid to white and/or non-Black employees performing the same or substantially similar job duties which require equal skill, effort, and responsibility, and under the same working conditions and at the same establishments.

109.     By the actions described above, among others, Defendants have violated the New York Labor Law.

110.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the New York Labor Law, Plaintiff suffered, and continues to suffer, harm for which he is entitled to an award of monetary damages and other relief.

111.    Plaintiff is further entitled to liquidated damages, reasonable costs, and attorneys' fees.

**THIRD CAUSE OF ACTION**
**Discrimination in Violation of Section 1981**
**(All Defendants)**

112.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

113.    By the actions described above, among others, Defendants have discriminated against Plaintiff on the basis of his race and/or color in violation of Section 1981 by denying him the same terms and conditions of employment available to employees who are white, including, but not limited to, subjecting him to disparate working conditions and denying him terms and conditions of employment equal to that of employees who are white.

114.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including but not limited to, loss of future income, compensation, and benefits for which he is entitled to an award of damages.

115.    Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff under Section 1981 for which Plaintiff is entitled to an award of punitive damages.

116.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, emotional distress for which he is entitled to an award of compensatory damages.

**FOURTH CAUSE OF ACTION**
**Sex Discrimination, Sexual Harassment and Retaliation in Violation of Title VII of the Civil Rights Act of 1964**
**(Against All Corporate Defendants)**

117.    Plaintiff repeats and re-alleges each allegation in the preceding paragraphs as if set forth fully herein.

118.    By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of sex, gender, and sexual orientation in violation of Title VII by subjecting him to disparate treatment based upon his sex, gender, and sexual orientation, including, but not limited to, subjecting him to sexual harassment, denying him raises, denying promotions, because he raised refused Ms. Yorio's sexual advances and because he made protected complaints of discrimination.

119.    As a direct and proximate result of Defendants' unlawful, discriminatory, and sexually harassing conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

120.    As a direct and proximate result, Plaintiff has suffered and continues to suffer, mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering, for which she is entitled to an award of compensatory damages and other relief.

121.    Defendants' unlawful discriminatory actions constitute malicious, willful and wanton violations of Title VII for which Plaintiff is entitled to an award of punitive damages.

**FIFTH CAUSE OF ACTION**

**Race Discrimination and Retaliation in Violation of Title VII of the Civil Rights Act of 1964**
**(Against All Corporate Defendants)**

122.     Plaintiff repeats and re-alleges each allegation in the preceding paragraphs as if set forth fully herein.

123.     By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of race, color, ethnicity, and national origin in violation of Title VII by subjecting him to disparate treatment based upon his race, color, ethnicity, and national origin, including, but not limited to, subjecting him to discriminatory investigations into his background, denying him raises, and denying promotions, because Defendants refused to accept that a man of African descent could have worked at top technology companies, and instead assumed he was a "scammer" based upon prejudicial views of African ancestry.

124.     As a direct and proximate result of Defendants' unlawful, discriminatory, and sexually harassing conduct, Plaintiff has suffered, and continues to suffer, harm for which he is entitled to an award of monetary damages and other relief.

125.     As a direct and proximate result, Plaintiff has suffered and continues to suffer, mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering, for which she is entitled to an award of compensatory damages and other relief.

126.     Defendants' unlawful discriminatory actions constitute malicious, willful and wanton violations of Title VII for which Plaintiff is entitled to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**Whistleblower Retaliation in Violation of NYLL § 740**
**(Against All Defendants)**

127.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

128.    As detailed above, Defendant subjected Plaintiff to multiple adverse employment actions because Plaintiff disclosed and/or objected to an activity, policy, or practice of Defendant that is in violation of a law, rule, or regulation that creates a substantial and specific danger to the public health or safety, including, but not limited to, promoting the equal treatment of Black men in the workplace.

129.    Defendants retaliated against Plaintiff in violation of the NYLL by adversely altering the terms and conditions of his employment, eventually leading to his termination, or in the alternative his constructive discharge because he reported up the Everyrealm chain of command to redress, among other things, Defendants' unlawful employment practices under the NYLL.

130.    As a direct and proximate result of Defendant's willful and unlawful conduct in violation of the NYLL, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of damages, to the greatest extent permitted by law.

131.    The foregoing conduct of Defendants constitutes willful violations of the NYLL for which Plaintiff is entitled to an award of punitive and/or liquidated damages.

### SEVENTH CAUSE OF ACTION
**Violations of NYLL § 215**
**(Against All Defendants)**

132.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

133.    Defendants retaliated against Plaintiff in violation of the NYLL by filing an arbitration against him for filing a Charge of Discrimination with the EEOC.

134.    Defendants also retaliated against Plaintiff in violation of the NYLL by threatening to sue Plaintiff if, among other things, he did not send them or their representative her personal computer and refrain from commencing this action in court to improperly dissuade him from vindicating his rights under the New York Labor Law.

135.    As a direct and proximate result of the unlawful retaliatory conduct in violation of the NYLL, Plaintiff has suffered and continues to suffer monetary and/or other economic harm for which he is entitled to an award of monetary damages and other relief.

136.    As a direct and proximate result of the unlawful and discriminatory conduct in violation of the NYLL, Plaintiff has suffered and continues to suffer mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress, anxiety, and the physical manifestations thereof, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

137.    The foregoing conduct of Defendants constitutes willful violations of the NYLL for which Plaintiff is entitled to an award of punitive damages, liquidated damages, and sanctions.

### EIGHTH CAUSE OF ACTION
#### Intentional Infliction of Emotional Distress
#### (Against All Defendants)

138.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

139.    Defendant engaged in conduct toward Plaintiff that is extreme and outrageous so as to exceed the bounds of decency in a civilized society; namely by, *inter alia*, subjecting him to unwanted sexually explicit come-ons.

140.    These actions were taken with the intent to cause, or disregard for, the substantial probability of causing severe emotional distress.

141.    As a direct and proximate result of Defendants' extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

142.    Defendants' conduct was wanton, malicious, willful and/or cruel, entitling Plaintiff to an award of punitive damages.

## NINTH CAUSE OF ACTION
### Defamation *Per Quod*
### (Against All Defendants)

143.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

144.    Defendant defamed Plaintiff by falsely telling others that he had lied about his work history.

145.    The statements made by Defendants were false.

146.    Defendants were at all times aware that these statements were false, or were recklessly indifferent to the falsity of these statements (a Google search of Plaintiff's name would have disproven them beyond doubt), and made them with the specific intention of damaging Plaintiff's reputation and maligning him to Defendants' employees.

147.    As a direct and proximate result of Defendants' defamatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

148.    As a direct and proximate result of Defendants' extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

149.    Defendants' conduct was wanton, malicious, willful and/or cruel, entitling Plaintiff to an award of punitive damages.

## TENTH CAUSE OF ACTION
### Defamation *Per Se*

**(Against All Defendants)**

150.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

151.    Defendant defamed Plaintiff by falsely and publicly telling others that he had lied about his work history. This constitutes a statement that Plaintiff had engaged in behavior incompatible with the proper ethical or professional conduct of his business trade.

152.    The statements made by Defendants were false.

153.    Defendants were at all times aware that these statements were false, or were recklessly indifferent to the falsity of these statements (a Google search of Plaintiff's name would have disproven them beyond doubt), and made them with the specific intention of damaging Plaintiff's reputation and maligning him to Defendants' employees.

154.    In making these statements, Defendants were acting with actual malice, as they were at all times aware that none of the statements were true or were acting with reckless indifference to the falsity of these statements.

155.     As a direct and proximate result of Defendants' defamatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, in an amount to be determined at trial for the following relief:

A.    an emergency preliminary injunction and TRO;

B.    a declaratory judgment that the actions, conduct, and practices of Defendants violated federal, state, and city laws;

C.      an award of economic damages;

D.      an award of compensatory damages;

E.      an award of monetary damages for mental anguish and emotional distress

F.      an award of punitive damages;

G.      an award of such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award;

H.      an award of reasonable attorneys' fees, costs, and expenses of this action;

I.      permanent equitable and injunctive relief; and

J.      such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

**Dated:** December 12, 2022                     Respectfully submitted,
         New York, New York

                                                 */s/ Shane Seppinni*

                                                 Shane Seppinni
                                                 Seppinni LLP
                                                 43 W 43rd St., Suite 256
                                                 New York, NY 10036
                                                 212-849-7000
                                                 shane@seppinnilaw.com

                                                 *Counsel for Plaintiff*